## COSTER v. GRISWOLD.

In the absence of fraud or failure of title, a surety, who guarantees notes given on the purchase of lands, cannot be relieved on the ground of hardship, inadequacy of consideration or extravagance of price.

Where a purchaser covenants and makes a pledge that the lands he sells shall, within a certain period, command a certain price and this is shown to have been impracticable and he becomes insolvent and his pledge inadequate, an equity arises in favor of the buyer, as well as of his surety, on notes given for the purchase money, so long as such notes remain in the hands of the seller on a bill *quia timet*. But, if an absolute assignment of the notes, in good faith, has taken place, for consideration, before causes for filing the bill arise or a right of set-off attaches or other equitable claim occurs, the assignee can hold irrespective of any after accruing right or equity. In such case, the court secures the equities which the debtor had against the original creditor up to the time of assignment. And such equities are not lost by a mere pledge of the notes by the seller —they continue up to and until a *bona fide* assignment as aforesaid.

Affidavits, denying the truth of matter proposed to be inserted in a bill by way of amendment, form no sufficient objection to the application to amend.

Proposed amendments, by executors, to a bill filed by their testator, can be allowed, although embracing statements which may never have been made by him and although they render no excuse for their not having been brought forward originally.

*It would seem*, that less strictness should be allowed in amending a bill where no injunction is in force or necessary to be sustained.

It is not usual for this court to grant an injunction to restrain actions in the federal courts, but leave a party to apply there to stay them until the equitable relief is granted here—confirming the case of *Schuyler* v. *Pelissier*, vol. 3, 191.

In order to reinstate an injunction pending an appeal, a case must be made showing something like irreparable injury if not allowed; but, even then, the application should be made to the chancellor.

*Practice.*
*Pleading.*
*Injunction.*
*Principal*
*and surety.*
*Vendor*
*and pur-*
*chaser.*
*Bill* quia
timet.

THE bill in this case, filed by John G. Coster, showed that one Jerry Cowles offered, by letter, to sell, to the Oswichee Land Company, twenty-eight thousand acres of land in Georgia for one hundred and sixty-eight thousand dollars, payable in the company's bonds at one, two and three years, to be guaranteed by the complainant, John G. Coster; the said Cowles to be interested in one-fourth, and to guarantee to the company that the lands should sell, within five years, for the full amount of the purchase money—and all his in-

terest, being one-fourth and two-tenths in the original pro-
perty of the company, should be subject to the obligation of
indemnifying the company for any loss from this purchase.
The proposition was not accepted. On the tenth of May,
in the same year, he extended his offer sixty days, from the
first of April, to sell thirty thousand acres at five dollars
per acre; and, if accepted by the company, his guarantee
was general and extended beyond the specific security
offered above. This offer was accepted by the trustee of
the company, Hamilton; and, sometime in May, the said
Jerry Cowles conveyed the lands, by deeds dated the twen-
tieth day of April, one thousand eight hundred and thirty-
eight to Hamilton, as trustee of one fourth for Coster and
Heckshers; one-fourth for Pettigrew, one-fourth for the said
Cowles, and one fourth for the said Hamilton. Simultane-
ously with the deeds, Hamilton, as trustee, executed twenty-
eight bonds, to the amount, in the aggregate, of one hundred
and fifty thousand dollars; they were all dated on the first
of May, 1838, and became due in the years one thousand
eight hundred and forty, one thousand eight hundred and
forty-one, one thousand eight hundred and forty-two and one
thousand eight hundred and forty-three—they were in sums
of seven thousand five hundred dollars and five thousand
dollars, and all made to carry interest at seven per cent. half
yearly. Mr. Coster's guarantee was endorsed on each note
under date of the first day of May, one thousand eight hun-
dred and thirty-eight. His guarantee was *gratuitous*, being
made at the request of his associates and on the faith and
guarantee and assurance of Cowles as to the ultimate sale
of the lands. And, simultaneously also with the execution
of the deeds and delivery of the bonds, Cowles executed and
delivered to the associates an indenture, dated the ninth day
of May, one thousand eight hundred and thirty-eight, recit-
ing the whole of the transactions; and covenanting that the
lands should be sold or capable of being sold within five
years from the date for the full amount of the purchase
money; that this amount might be realized by selling at
public auction within six months afterwards all such of the
said lands as might be unsold at the end of the five years;
and if, after the whole of the lands should be sold within

1844.

COSTER
v.
GRISWOLD.

five years and six months after this date, the whole amount of money accruing from the sales should fall short of the aforesaid purchase sum of one hundred and fifty thousand dollars and the interest thereon, then he, Cowles, would indemnify and save them harmless against any loss by reason of the said sales of the said lands producing a less sum than the said one hundred and fifty thousand dollars and interest. And he, therein and thereby, mortgaged and pledged the whole of his share and interest in the company, &c., for the fulfilment of such, his guarantee, with this further understanding and agreement between the parties that, at the expiration of the five years, should the one hundred and fifty thousand dollars, with interest, not be refunded to the company by the sale of the Georgia lands, that, then, Hamilton for the company should put up such of the Georgia lands as remained undisposed of to be sold for cash at auction, giving six months previous notice and if, from the said sale or attempt to sell, the balance of the one hundred and fifty thousand dollars, &c., should not be produced, then, the one-fourth interest of Cowles in the company should be advertised to be sold for cash, giving six months notice by advertisement, unless, indeed, the company should agree to take Cowles's share at private sale upon terms to be agreed on. The five years expired on the ninth day of May, one thousand eight hundred and forty-three. The lands had not, nor had any part been sold, nor were they capable of being disposed of except at an enormous sacrifice on the cost, and all attempts by the trustee to sell had been unavailing. One half of the company's bonds, to the amount of seventy thousand dollars, with forty thousand six hundred and twenty-five dollars for interest, had been paid by them. No part of these payments were made by Cowles or came out of his interest or share in the company; but the greater part was paid out of money obtained by means of Coster's, the complainant's, credit and for the amount of which he was then liable. In the autumn of the year one thousand eight hundred and forty-one, the said Jerry Cowles became embarrassed. The company were, then, apprehensive that the lands would not sell within the five years, except at a very great sacrifice; and that Cowles would be unable to indem-

nify them. They determined to pay no more principal or interest. Cowles, shortly after, became utterly insolvent; was declared a bankrupt; and obtained his discharge. The interest of Cowles in the company (independent of the Georgia lands) afforded no security whatever by way of indemnity. All the other associates of the company were insolvent or unable to pay any portion of these bonds and the whole burthen of them rested on the complainant, Coster. Two suits at law had been commenced against him on his guarantee. In one suit, six of the bonds were declared on, each for five thousand dollars, payable the first day of May, one thousand eight hundred and forty-two, and one for seven thousand five hundred dollars, payable at the same time— and for twenty-seven thousand five hundred dollars for interest from the first of May, one thousand eight hundred and forty-two. These were the remaining fourteen bonds, amounting to seventy-five thousand dollars. The suits were in the name of Cowles, but it was alleged they were for the benefit of the defendant George Griswold and others, who had obtained the bonds under a blank assignment endorsed upon each note, signed by Jerry Cowles under date of May eighth, one thousand eight hundred and thirty-eight, (the time when they were made.) About the tenth day of May, one thousand eight hundred and thirty-eight, Cowles obtained an advance of seventy thousand dollars from the United States Bank in their post-notes, for his note of seventy thousand dollars at nine months and by a deposit of the fourteen bonds as collateral security. Cowles's note fell due the tenth day of August, one thousand eight hundred and thirty-nine and was not paid. On the twenty-eighth of the same August the agent of the United States Bank at Macon in Georgia gave notice to Cowles that the Bank would sell the bonds at auction in New York sometime in September or October then next, and would give sixteen days notice of the time and place of sale in the Express and Commercial Advertiser newspapers; but no such notice was ever given and no such sale was ever made; and, on Cowles coming to the city of New York, it was postponed indefinitely and no other notice or sale had ever been given or made. On the second day of October, one thousand eight hundred and

forty-one, the said Cowles went to Philadelphia, and, wish-ing to take up his note for seventy thousand dollars and withdraw the bonds deposited as collateral security, tendered to the then president of the bank sixty-five thousand nine hundred and ninety dollars in the notes of the bank in full payment of the amount then due on his note. This tender was declined and the delivery up of the note and bonds was refused, under pretence that the latter had been disposed of and the proceeds credited to the account of the note, leaving a balance of twelve hundred and forty-four dollars and eighty-seven cents; and the account in relation to which was set out in the bill. The said Cowles requested to be informed as to who were the purchasers of the bonds, when the cashier of the bank informed him that, as to the sale of nine of the bonds amounting to forty-seven thousand and five hundred dollars disposed of at twenty per cent. discount, as credited on the first day of March, one thousand eight hundred and forty-one, he could not say to whom they were sold, nor whether at public or private sale, but, as to the sale of five of the bonds, equal to twenty-seven thousand five hundred dollars, as credited on the sixth day of August, one thousand eight hundred and forty-one at ten per cent. dis-count, they had been sold to the defendant, George Gris-wold and Richard Alsop at private sale. That Cowles never had received any notice of such sales and the above was the first intimation he had ever had that the fourteen bonds had been parted with; and he, immediately thereafter, say on the second day of October, one thousand eight hundred and forty one, gave notice that he should repudiate the sales as made in fraud of his rights. By a statement set out it appeared that the balance due on his note was sixty-five thousand two hundred and twenty-six dollars and sixteen cents; and it was alleged that this was all that was due and that it was fully covered by the tender. It was stated that Cowles never made any assignments to Griswold or any other person—nor did the bank make any in writing; and also averred that no consideration passed or was paid at the time for the bonds by Griswold and Alsop, but that the bonds were delivered in pursuance of some private understanding and on account of antecedent matters and in fraud of Cowles's

rights. That the bank had no right to sell or part with the possession of the bonds and such act was wholly unwarranted and unlawful. That the defendants took them subject to all the equities existing between the bank and Cowles and had acquired no right or title to the bonds. The complainant was advised and insisted that Cowles's agreement and covenant of the ninth day of May one thousand eight hundred and thirty-eight limited his, the complainant's liability as surety of the bonds and that his guarantee was subject to the provisions of that instrument and went with the bonds wheresoever they went. Also, that the consideration of the bonds had wholly and entirely failed and was no longer of any effect or, at all events, that he was entitled to a deduction of the difference between what the lands should produce on a sale and the consideration money and interest agreed to be paid. The complainant insisted that the present holders of these fourteen bonds had no right or title to them and ought not to be allowed to prosecute them; and he was desirous that the lands in Georgia should be sold—and there were no means of determining what the ultimate deficiency would be except by an actual sale; and he could not interpose his just and proper defence at law in the suits brought against him; and insisted that the further prosecution of them should be stayed until a sale could be made and the deficiency ascertained. *Prayer :* that the lands might be sold under the direction of the court; that Hamilton, the trustee, might join and execute deeds to the purchaser; that the proceeds might be applied on the bonds, &c., and that the complainant might have the benefit of the deficiency which Cowles might be found liable for and that the fourteen bonds should be delivered up. And an injunction against the further prosecution of the suits at law.

An injunction had been granted.

By a joint answer put in, it appeared : that the defendant George W. Gray, the son in law of the defendant George Griswold, was the assignee of the nine bonds for forty-seven thousand five hundred dollars and was prosecuting one of the suits on behalf of himself, George Griswold, Nathaniel L. Griswold and Richard S. Griswold, composing the firm of N. L. & G. Griswold, who bought an interest of forty-

three thousand and seven dollars and eighty-nine cents in the said note of Jerry Cowles. That the purchase took place about the first day of March one thousand eight hundred and forty-one ; and that there was then due on the note the sum of sixty-seven thousand nine hundred and seven dollars and twenty-one cents. That they purchased that interest for a good and valuable consideration. And as to the remainder of the note, that the same was purchased from the United States Bank on the sixth day of August one thousand eight hundred and forty-one for a good and valuable consideration by the defendants Richard Alsop and George Griswold. That when the said Alsop and George Griswold purchased the five bonds, with the guarantee on each and the assignments in blank, they were delivered to them to be held as collateral security for the payment of the amount of their interest in the note and had always since remained in their custody and possession and in that of the executors of Alsop ; and so it was with the nine bonds purchased by N. L. & G. Griswold and held as collateral security for the payment of the amount of their interest in the note. That the assignments on the bonds were in blank, on the eighth day of May one thousand eight hundred and thirty-eight, but, about the times of their purchase, the assignments were filled up with the name of the said George W. Gray, who was, thus, constituted a trustee for the said N. L. & G. Griswold ; and the remaining five were filled up with the names of R. Alsop and George Griswold by themselves. The defendants insisted that they had a valid title. They stated, on information and belief, how the United States Bank, through Nevins and Townsend, as agents for Jerry Cowles, took the note of seventy thousand dollars for value received by him of the bank and the fourteen bonds, with the guarantees and assignments in blank as collateral security for the payment of the note. That the deposit of the bonds was made with the knowledge and approbation of the complainant and Hamilton ; and that the funds thereby procured were applied to their use and the use of their associates in the Oswichee Company. They submitted that by the delivery of the note and the bonds to the bank, the said Cowles authorized the filling up of the blanks in the assignments to any holders.

They admitted that there had been no other written assignments or other transfer of the title than the said deposit for the purpose of collaterally securing the payment of the note ; and that all the rights of Cowles, as owner of the fourteen bonds, subject to the deposit, were reserved to and retained by him and had never been given up or relinquished; and that the note became due on the tenth day of August one thousand eight hundred and thirty-nine and was not paid. The defendants further answered that they did not know and could neither admit nor deny the notice of the United States Bank at Macon about selling the bonds in September and October, 1839, or that no notice of sale was ever given ; but admitted that the bonds were not advertised or exposed for sale at any time in the city of New York. They said they were ignorant of any tender having been made. They admitted that sixty-five thousand two hundred and twenty-six dollars and sixteen cents was the whole amount due upon the note on the second day of October one thousand eight hundred and forty-one ; but they denied that the suggested tender of bank notes was equal to that sum or that the bank had any interest in the note or bonds at that time. And as to their purchase they said that the interest in the note purchased by N. L. & G. Griswold was paid for by them to the bank in lawful money of the United States actually advanced at the time of the purchase and as the consideration for the same and that, ever since, such slice of the said note and the bonds collateral thereto had been and were their sole property. That the interest in the note purchased by Alsop and Griswold was obtained for a *bona fide* consideration, the full value whereof was received by the said bank at the time in part payment thereof and in lieu of so much money then due to them and payable on an award made in their favor against the bank by arbitrators. They denied all knowledge and notice of any equities against the note or the fourteen bonds or any defence against the payment thereof ; and that they took them in the confidence that the complainant, from having paid the interest from time to time as it accrued, had recognized the validity of the bonds and that they had been given to Cowles to be negotiated by such transfer for the benefit of the complainant and his associates.

1844.

COSTER
*v.*
GRISWOLD.

They denied that no consideration passed at the time, &c. ; and submitted that they had a good title and had good right to hold, free from any counter equities. They insisted that it was apparent from the face of the bonds and guarantees that they were made with the design and intent to pass into the hands of persons other than Cowles and to be available to whomsoever might become the lawful holders. Also, that the same were not limited or controlled by Cowles's covenant of the ninth of May one thousand eight hundred and thirty-eight and were not subject to a deduction for any loss or difference in the sale of the lands, &c. That if such had been the complainant's intention, he should have expressed it by some words in his guarantee or by some memorandum on each bond. And they submitted that they were not necessary parties to the bill for the purpose of a sale of the lands ; and insisted that it would be unjust to stay their suits at law until such sales could be had.

A motion was now made to dissolve the injunction on bill and answer.

Mr. *Bidwell* and Mr. *G. Griffin*, in support of the motion.

Mr. *J. P. Hall* and Mr. *Lord*, contra.

*March* 11, 1845.

THE VICE–CHANCELLOR :—There is no difficulty about the facts of the case as presented by the bill and answer. Much of the bill stands uncontradicted by the answer and is, therefore, to be taken as true for the purposes of this motion ; and upon the statements of the bill which are either admitted or not denied (because there are many things alleged which took place anterior to March one thousand eight hundred and forty-one of which the defendants were ignorant and can neither admit nor deny) the question arises— what are the equitable rights of the complainant?

1st. As between the complainant and Cowles the obligee of the bonds ?

2d. As between the complainants and the assignees or present holders of the fourteen bonds in controversy ?

These bonds, with fourteen others, having been given for the purchase money of lands bought of Cowles and their

payment having been guaranteed by the complainant Mr. Coster in a manner to bind him in law as a surety, he cannot be relieved from his liability on the mere ground of hardship or of inadequacy of consideration or of the extravagance of the price agreed to be paid for the lands. No fraud is alleged in the contract of sale, nor any failure of title to the lands conveyed, so as to work a failure of consideration for the bonds. But, simultaneously with the conveyance and the giving of them and as a part of the same transaction, though varying a few days from the date of the other papers, the vendor, Cowles, executed, under his hand and seal, an instrument of covenant and agreement on his part (dated the ninth day of May one thousand eight hundred and thirty-eight) which had the effect to modify, very materially, the rights of the parties to that transaction as between themselves in relation to the benefit the purchasers were to derive from it. Whether the purchasers have taken the steps which were necessary with regard to the disposal of the lands, in order to bring themselves within the true meaning and interpretation of Cowles's covenant to remunerate and indemnify them against any loss or deficiency upon a resale, is a point upon which counsel have widely differed. According to my understanding of Cowles's covenant, however, and from what I believe to be its fair construction, the allegations of the bill, as to the utter impracticability of selling the lands during the five years or five years and six months within which he stipulated the lands should be sold or be capable of being sold at remunerating prices, show that a breach of his covenant has been incurred. And from this failure to sell the lands, taken in connection with the fact of Cowles's bankruptcy and the inadequacy of the security pledged by him to make good the loss or deficiency as averred in the bill, an equity arises in favor of the purchasers and of the obligor and guarantor of the bonds as against Cowles, to be relieved from the payment to him—at least, to the extent of such loss or deficiency. While, therefore, the bonds or any of them remained in Cowles's hands and even before the expiration of the five years allowed for the sales, upon well founded apprehension of ultimate loss satisfactorily made to appear, arising as well from Cowles's

insolvency as from the impossibility of effecting sales "except at an enormous sacrifice upon the cost," this court would have entertained a bill, *quia timet,* for an injunction to restrain him from parting with the bonds or enforcing payment thereof to the full extent. This could have been done on the principle established in *Lindsay* v. *Jackson,* 2 Paige's C. R. 581.

It would be otherwise, however, if the right of a third person had intervened under an assignment or transfer for valuable consideration before cause for filing such a bill arose or a right of set-off attached or other equitable claim could be asserted to prevent a transfer; and where an assignee takes in good faith, his right to hold will not be disturbed or divested by any subsequent event or after-accruing right or equity of the debtor: *Chance* v. *Isaacs,* 5 Paige's Rep. 592. All that the court of law or equity can do in such cases, since they recognize and protect the rights of assignees of choses in action, is, to allow them to take, subject always to any defence, legal or equitable, which existed in favor of the debtor against the original holder or creditor at the time of the transfer or assignment. Now, the question arises: what existing equity or defence was there against these bonds or the right of Cowles to part with them in November one thousand eight hundred and thirty-eight, when he pledged and deposited the same with the United States Bank as collateral security for the payment of his note of seventy thousand dollars?

At that time (only six months after the giving of the bonds) Cowles had not become insolvent and no apprehension of a loss or deficiency from the sales of the lands was felt. Nothing had occurred to change the aspect of their affairs or to give rise to any restriction or claim upon him not to use the bonds in any way he might think proper. The bonds had, evidently, been made to be sold or transferred as his convenience or necessities might require: else, why so many bonds with a guaranty on each and in sums adopted to a convenient use by assignment and calculated to give them a sort of currency, instead of one bond for the whole debt of one hundred and fifty thousand dollars, payable by instalments or why was not Cowles put under a

stipulation, in his agreement of the ninth day of May one thousand eight hundred and thirty-eight, not to part with them or with that portion of them having the longest time to run, until, from experience, with regard to the disposal of the lands, some opinion could be formed of the probable results of their sales? No restriction was imposed upon the transfer, so that Cowles was at liberty, at any time, to sell and assign the bonds absolutely or to pledge and hypothecate them, as he did, to the bank; and it was competent for the bank to take and hold them as security. The only equity they were subject to, in the hands of the bank, was the equity of redemption or right to redeem by paying off the note. That right to redeem still exists and has followed the fourteen bonds in question into the hands of the present defendants, who, by their answer, admit that they took them from the bank—not by absolute purchase, but as collateral security for the payment of the shares or interests which they respectively bought in the seventy thousand dollar note in the months of March and August one thousand eight hundred and forty-one; and they admit, also, that the amount due on the note, when they bought it, was several thousand dollars less than its face. Whatever that amount is, as between the bank and Cowles, the defendants are entitled to receive and no more; and payment of the bonds should not be required beyond the amount that will be necessary to satisfy the note. All over and above the balance due on the note, with interest, the obligor of the bond and Mr. Coster, as surety and his representatives should be excused from paying: inasmuch as the surplus would belong to Cowles or his assignees in bankruptcy and, as to Cowles and volunteers claiming in his right, the obligor and surety are entitled to be protected; unless, indeed, the allegations of the bill, in relation to the unfortunate result of the speculation in the lands bought of Cowles, can be disproved.

Some reliance has been placed upon the tender in bank bills made by Cowles to the bank on the second day of October one thousand eight hundred and forty-one and which was sufficient in point of amount to cover the balance then due on his note. But, this tender was made after the bank had ceased to have any interest in the note, as is shown in

1844.

COSTER
v.
GRISWOLD.

the answer; and I do not perceive how it can affect the rights which the defendants had then acquired.

The injunction, in my opinion, must be modified or so far dissolved as to allow the suits at law on the fourteen bonds in question to proceed to trial and judgment: but with a stay of execution on the judgments until the amount due upon the note, for principal and interest, is ascertained or can be determined either at law or by this court. And with leave, then, to apply to remove the injunction entirely.

Order accordingly. Costs to abide the further order of this court.

This case came again before the court.

The complainant, John G. Coster, had died on the eighth day of August in the year one thousand eight hundred and forty-four; and the suit was revived in the names of George Washington Coster and Henry Arnold Coster, as his executors.

An appeal was pending from the above decision of the vice-chancellor.

By the death of the said John G. Coster, the actions at law in the supreme court had abated; and since the modification of the injunction, two other suits had been instituted in the name of the defendant Jerry Cowles against the executors of the said John G. Coster in the circuit court of the United States for the southern district of New York.

The present complainants had filed a supplemental bill, praying for an injunction to restrain these actions in the United States Court.

Sept. 26.
1845.

And, now, came up, not only a motion for such an injunction, but one to amend the original bill and a third to reinstate the original injunction pending the appeal.

The defendants, by affidavit, denied the truth of the matter contained in the proposed amendments; and also insisted, on the argument, that such matter could have been inserted in the original bill during the life time of the original complainant, John G. Coster.

Feb. 24.
1846.

THE VICE-CHANCELLOR:—Three several motions are made: 1. To allow the complainants to amend the bill.

2. For an injunction on the supplemental bill to restrain the suits commenced in the circuit court of the United States. 3. If such injunction cannot be granted, then, to reinstate the injunction heretofore granted, pending the appeal from the order by which that injunction was so far modified as to allow the defendants (plaintiffs in the action at law) to proceed to trial and judgment in that suit.

I can perceive no substantial objection to the granting of the motion to amend. The allegations proposed to be introduced into the bill may be of importance in determining the case, provided they are supported by evidence; and the denial of them at this time, by affidavits, furnishes no sufficient reason why the complainants should not have an opportunity of putting the matter in issue and proving it, if they can. The new matter is not inconsistent with, but merely in addition to what is already set out in the bill. And the objection that executors cannot be allowed to add to a bill, by way of amendment, because their testator is thereby made to say what he never did say in his lifetime and that the executors cannot render a sufficient excuse for the testator for not bringing forward these allegations in the bill when first filed, seems to me not of sufficient weight to prevent the order being granted. It is not asked to make this amendment without prejudice to an injunction, because the injunction has been virtually dissolved and, perhaps, less strictness should be required in allowing amendments where the upholding of a preliminary injunction is not the object. The motion to amend is granted, on payment to the defendants of their costs of the motion.

Then, with regard to the granting of an injunction on the supplemental bill, to restrain the suits commenced in the federal court in the place of the suits in the state court which abated by the death of the testator John G. Coster. The objection rests upon that rule of comity, which this court has prescribed to itself, not to interfere with the proceedings of the Courts of the United States: *Schuyler* v. *Pelissier*, 3 Edwards's V. C. Rep. 191. Instead of awarding an injunction, the present complainants must be left to pursue the course pointed out in *Schuyler* v. *Pelissier*, by an application to the court in which the suits are instituted, to

*1844.*

COSTER
*v.*
GRISWOLD.

stay the proceedings therein until the matter of equitable relief can be heard and finally determined in the court of chancery. The motion for an injunction on the supplemental bill must be denied.

The complainants, then, ask, that the injunction, as originally granted, may be reinstated pending the appeal from the order virtually dissolving it. There are several palpable objections to this motion. In the first place, the injunction, if restored, would be ineffectual: the suits which it enjoined having abated and being no longer in existence. And to restore the injunction, with express reference to and operation upon the new suits in the circuit court of the United States would be the same, in effect, as granting an injunction on the supplemental bill—which, the court has shown, cannot be granted. Besides, if it is proper to reinstate an injunction pending an appeal from the order dissolving it, special facts and circumstances should be shown to render such a step necessary, in order to preserve the property in the meantime or to prevent irreparable injury: *Hart* v. *The Corporation of Albany,* 3 Paige's Rep. 381. Nothing of the kind appears in this case; and even if it could be shown, I am inclined to think that the application should be made to the chancellor, who, alone, has control of the appellate proceedings. This last motion is, also, denied, with costs to be taxed.