Caruthers, J.,
delivered the opinion of the Court.
This was an. action of trover for the conversion of the plaintiff’s negro slave, Ike. The proof shows that the slave, having run away, was arrested in Kentucky, and brought aboard the defendant’s steamboat at Eddy-ville, by the plaintiff, and the passage of both paid to Nashville. The master had his slave securely tied with his hands behind him, and on the boat he was fasten *263 ed to a post. The acts complained of, cas constituting the conversion, are thus detailed by Smith, the engineer, on the boat: “ Sometime during the day that the negro was put on the boat, he- untied him and put him to pumping water on the boat, between Eddyville and Clarksville, and that • defendant was present when he untied him, and saw him, that after the negro was done pumping, he tied his hands behind him again, as they were, but did not tie him to the post again. That, on the next, day,. when they were about thirty miles below Nashville, he untied the negro again, and put him to pumping water, but after he Was done pumping, he tied his arms as they were before, but did not tie him to the post. The negro walked about on the lower deck with his arms tied behind him.”
“ Scruggs saw the negro walking on the deck and knew that he had been untied, from the post, but he never authorized the negro to be untied, or put to pumping, nor, so far as the witness knows, did he know that the negro had been pumping.” The boat stopped at several points on the way, and on the arrival at Nashville he was missing, and never has been found. He doubtless jumped into the river in attempting to make his escape, and was drowned. Smith also proved that the negro told him the first day he was on the boat, “that the plaintiff had made threats of ill treatment towards him, and that he did not intend to go home. He told Love, the clerk of the boat, “that he would die or jump overboard before he would go home.” This witness proves the facts about as they are told by Smith, in relation to the pumping, &c.
The defendant, Davis, was the owner of the boat and *264 was on board at the time tbe plaintiff came aboard, and until they reached Clarksville.
. . The Court charged the jury, that the acts proved would amount to a conversion, if done without the consent or approbation, either expressed or implied, of the owner. But he further charged the jury, that “ if the plaintiff was not present, or did not know of the act done at the time it was done, yet the jury might look to the character of the act done, the motive with which it was done, the circumstances under which it was done, the manner of doing it, and the relation existing at the time between the plaintiff and defendant; and if from the whole taken together, they believed he would have consented had he known it, at the time it was done, it would not amount to a conversion in law, and the negro having been subsequently lost, the owner could not then elect to treat it as a conversion.” The jury found for the defendant, and the plaintiff rests his ■argument for a new trial upon the supposed error in the part of the instructions to the jury above extracted.
We think the argument cannot be resisted. The questions in such cases are, whether the acts amounting to a conversion were assented to, or sanctioned before, or at the time they transpired, or afterwards waived; .not what the jury may suppose, from circumstances, the Owner would or should have done. The decision must be made upon facts to be found in the proof, not upon conjecture. The rule laid down by the Court is entirely too vague and uncertain for practical purposes. It will not do to guess what the owner would have done under a given state of facts, but his rights must depend upon what he did, not what it might be in *265 ferred lie would lave done. Did he expressly consent, or did his knowledge and acts, or his silence, authorize it to he inferred as a fact, that he consented and approved of what was done?
The general rule is, that any unauthorized assumption of ownership, or control over the property of another, amounted to a conversion, and subjects the wrong doer to an action for the value.
To avoid this consequence the defendant must show that the wrong has been waived by some act, or course of conduct on the part of the owner. This may he done by taking possession of the property subsequently, or by any acts which clearly indicate a continued claim of right to the thing by the owner. In the case of Cummings vs. Bell, 3 Sneed, 275, this subject was fully examined. That was a case of sub-hiring, which was held to amount to a conversion. What would amount to a waiver, was there discussed. In this case, if the owner, with a knowledge of what had transpired, had continued his control of the slave, and by his acts in relation to-him, evinced that he still regarded him as his property, he could not after the accident happened, elect to bring an action of trover, which is founded on a change of pro-pertyagainst his will. In such a case he would only have a right to sue in trespass for the injury done to the slave by the wrongful act.
But there is nothing in the proof going to show that he sanctioned what was done, or in way waived his right to sue for the slave. The proof made by the defendant as to the threats of Ike, that he would not return to Nashville, and that he would die first, &c., should have had the effect of increasing his vigilance in *266 •making him secure, instead of enlarging his liberty, and thereby affording facilities to escape, as was done by releasing him from his confinement.
The defendant was a bailee for hire and should have strictly observed all that care and caution against accidents, incident to that character, by the law of bailments.
There can be no doubt but that the slave was lost in consequence of the conduct of defendant. If he had been cqntinued fastened to the post, as the owner placed him, he could not have made his escape. There is nothing to favor the idea presented in the argument, that motives of humanity, actuated the defendant in unloosing the cords with which the slave was bound, to relieve him from pain and suffering. It does not appear that any unnecessary severity was used by the master, but that his only object was. to make him safe and secure, and this much his past conduct certainly justified. The object of the defendant was manifestly to obtain the labor and assistance of the boy in pumping his boat, and this without the leave of the owner. He doubtless thought no injury would result from it, and intended no wrong to the owner or the slave. But still it was an unauthorized liberty to take with another’s property, and the assumption of ownership must subject him to all the legal consequences of such acts, without regard to his motives or anticipations. We would not say that a case of the kind supposed, might not exist, in a case of great suffering.
Whether the slave had been lost or not, under the facts here presented, the plaintiff would have had a right to regard the title of the property as changed, *267 and sued for and recovered the value: yet, whether he would have done so, or resumed his ownership, or otherwise sanctioned what was done, thereby waiving the wrong, was a matter to be decided by himself. But as the slave was lost, his interest would naturally have prompted him to avail himself of his legal right to regard the interference with his property as an act of conversion.
The argument may also be conceded, that if an urgent necessity had arisen, requiring the exertions of all on board to save the boat, the assistance of the slave might have been commanded with impunity. But no such emergency existed, and the question does not arise.
We are referred to a recent case in England, of Foulders vs. Willoughby, 8 Meeson & Welsby, 540, which 'it is insisted reviews and modifies the doctrine on the subject under discussion.
In that case the plaintiff embarked with his horses Upon a ferry-boat, and paid the fare, but so misconducted himself, that the defendant, being the owner of the boat, ordered him to take his horses on shore, and he refusing to do so, the defendant put them off, and they were taken to a hotel, and sold for their keep.
The Judges in that case gave several opinions, but all held that although a simple asportation of a chattel may be a sufficient foundation for an action of trespass, it did not necessarily establish a conversion: yet, that any asportation a chattel for the use of the defendant, or a third person, or with the intention of exercising over it an ownership, inconsistent with the real owner’s rights, will amount to a conversion.
Baron Alderson, in the conclusion of his opinion, *268 states: “ The question ought to have been left to the .jury to say, whether the act done by the defendant, of seizing the horses and putting them on shore, was done with the intention of converting them to his own use, that is, with the intention of impugning, even for ■a moment, the plaintiff’s general right of dominion over them. If so, it would be a conversion, otherwise not.” The Judges also held' in that case, that there was evidence in the facts to authorize the jury to have found a conversion, but they set aside the verdict, because the Judge had misdirected the jury, and directed them, that the single fact of putting the horses on shore amounted to a conversion. The case was put to them on only one part of the evidence. But Rolfe B. ■agrees with Gurney B. in holding, that, “not only was there evidence of a conversion, but there was such as would have fully warranted the jury in coming to the conclusion at which they arrived.”
But, if that case as proved, was strong enough to have authorized a verdict against the defendant under a proper charge, would it not have been entirely clear, if the defendant, in addition to what he did do, had put the horses to his own use ? -
That further fact is required, to mate it analagous to the case before us. Suppose it had been a boat propelled by horse power, and they had been put to work against, or without the owner’s consent, would there have been any doubt in the case, according to the principles laid down by the Judge?
The judgment must be reversed for the error in the charge first noticed, and a new trial had upon the ■principles above stated.