**Willard R. HIELD, Respondent,**

v.

**Edwin R. THYBERG, Appellant.**

**No. C3–83–511.**

Supreme Court of Minnesota.

April 27, 1984.

**504**

John B. Waldron, Minneapolis, for appellant.

Alan C. Eidsness, Bruce C. Recher, Minneapolis, for respondent.

SIMONETT, Justice.

Although the trial court properly allowed plaintiff to use parol evidence to explain the purpose and vary the term of a written contract, we conclude, on the facts of this case, that plaintiff should have been required to prove his case by clear and convincing evidence. We reverse for a new trial.

On June 10, 1977, plaintiff-respondent Willard R. Hield sold his half interest in a corporation, Beauticians Supply, Inc., to defendant-appellant Edwin R. Thyberg, owner of the other half interest. The sale was accomplished by a written document entitled "Assignment," signed by Hield, which provided in part:

> For and in consideration of *Fifteen Thousand* Dollars (*$15,000.00*), Willard R. Hield, of Minneapolis, Minnesota, does hereby assign, order and transfer to Edwin R. Thyberg, of Sioux Falls, South

Dakota, all of my right, title and interest in Beauticians Supply, Inc., a corporation, including but not limited to any and all advances made by me to the said corporation and all of my common shares of capital stock * * *.

\* \* \* \* \* \*

The undersigned assignor hereby acknowledges that the assignee assumes no other personal liability toward assignor * * *.

The $15,000 was paid at the time the assignment was signed by Hield. Sometime thereafter, Hield transferred his stock certificates to Thyberg.

In January 1979, plaintiff Hield sued defendant Thyberg, alleging in his complaint that he had sold his corporate shares "for a total consideration of $50,000, $15,000 cash at closing and $35,000 in a promissory note." Plaintiff further alleged that Thyberg, by agreeing to pay $50,000 and then refusing to perform, had committed fraud. The case was tried to a jury. Over defendant's objections, plaintiff was permitted to testify that defendant, indeed, had agreed to pay an additional $35,000 for the corporate stock. Defendant denied any such agreement. The trial court dismissed the fraud allegations, but submitted the contract issue to the jury. The jury resolved the fact issues in favor of plaintiff and, pursuant to the verdict, judgment was entered in favor of plaintiff and against defendant for $35,000 plus 6% interest from June 10, 1977. Defendant Thyberg appeals from the judgment.

The issue is whether the parol evidence rule applies. If it does, plaintiff is bound by the $15,000 agreed consideration set out in the written document and can collect no more. If the parol evidence rule does not apply, there is evidence to sustain the jury's verdict that the true consideration was $50,000, not $15,000. We conclude

that parol evidence may be used here but under a higher burden of proof.

When the case was called for trial, the trial court denied defendant's motion to exclude parol evidence and allowed plaintiff's evidence to be received.[1] At the close of all the testimony, defendant's motion for a directed verdict was denied, the trial court observing, "I have grave reservations about this particular lawsuit and I have no hesitancy about stating it."

The parol evidence that came in was essentially as follows. Negotiations for the sale of Hield's interest in the corporation to Thyberg began in the spring of 1977. Beauticians Supply, Inc., was a South Dakota corporation with separate divisions operating in Sioux Falls and Minneapolis. (Prior to 1975, the two divisions were separate corporations, but in that year they were merged into the one South Dakota corporation.) Thyberg was active full time in the business and had made a success out of the South Dakota operation. The Minneapolis operation was losing money. Indeed, in the spring of 1977, a bank in Minneapolis threatened to foreclose its mortgage of about $72,000, a mortgage which Hield personally guaranteed. Hield, himself, was not active in the business, except in a very general supervisory way. He had inherited the company from his father, and his main occupation was stockbroker. At the time of the transactions in question, Hield had serious personal and financial problems and needed cash.

On April 18, 1977, Thyberg said he would purchase Hield's stock for either $10,000 or $15,000 plus an additional sum paid over a period of 5 years, not to exceed $72,000 plus interest, depending on the profitability of the business and the ability of the corporation to use the net operating loss carryover created by the poor performance of the Minneapolis division. Papers were to be drafted by the corporation's attorney, John Flaten, after more data was gathered.

---

1. "The evidence that the rule seems to exclude must sometimes be heard and weighed before it can be excluded by the rule." 3 Corbin, Contracts § 582 at 450 (1960). Much is left to the trial court's discretion in the particular case. Rather than say that the parol evidence rule prohibits "admission" or "allowance" of certain evidence, it may be better to say that the rule, if it applies, prevents the "use" of parol evidence.

On May 16, with the bank pressing for payment, Thyberg indicated to attorney Flaten that the April understanding "was still in place."

The key date is June 10, 1977. On that day defendant Thyberg came to Minneapolis to close the deal with plaintiff Hield. Thyberg brought with him the typed "Assignment" paper previously mentioned, which had been drafted by his attorney in Sioux Falls with a blank space provided for insertion of the amount of consideration. Thyberg and Hield held three meetings on that day—at 8 a.m., then about 11 a.m., and finally again at 5 p.m. Hield testified that Thyberg agreed to pay $50,000, $15,000 down and the balance by a demand note which Thyberg would send as soon as he got back to Sioux Falls. Hield testified that Thyberg was intending to get an SBA loan and consequently did not want the $35,000 to show on his balance sheet. With this understanding, Hield says he had his secretary type in the blank space a $15,000 consideration, plus an indemnity provision at the bottom of the paper. He then signed the assignment and accepted Thyberg's check for $15,000. Thyberg testified that at the 8 a.m. meeting, he did, indeed, say that payment of a sum in addition to $15,000 "might be a possibility," and that "[i]f there was any other way I could raise any more money, I would,"— but that this depended on whether the business would be profitable and would be able to use the tax loss carryover. It was Thyberg's position that after these preliminaries, however, he offered to pay only $15,-000 plus agreeing to save Hield harmless on his personal guarantee of the bank mortgage. Thyberg said he would have elected to liquidate the company if these terms had not been agreeable to Hield.

We have the testimony of one other witness, John Flaten, a Minneapolis attorney then representing the corporation. Flaten met with Hield in his law office about 9:15 a.m. on June 10. He also had a telephone conversation with Hield (with Thyberg by Hield's side) about 11 a.m. Flaten kept notes of these two conversations. At the 8 a.m. meeting, Hield showed Flaten the assignment document and, according to Flaten's notes, "Bill [Hield] indicated that Ray [Thyberg] had offered a flat $15,000 cash at closing without any further consideration." Thyberg apparently was claiming that his prospective lender in Sioux Falls would not agree to any different payment arrangement. Flaten's notes show that Hield thought the company, if liquidated, might net $70,000 to $90,000 subject to a $20,000 advance owed Thyberg. Flaten suggested to Hield that he should attempt to negotiate for more money, with any sum over $15,000 to be paid on an installment basis, and to get an indemnity clause for his personal guarantee on the bank loan. During the 11 a.m. telephone conversation, Flaten's notes indicate that Hield and Thyberg were concerned that any additional consideration over $15,000 might prejudice the SBA loan and that it might be better to defer this aspect of their deal. Flaten told Hield over the phone that any camouflaging of the additional monies might be seen as complicity in the making of a fraudulent SBA loan application. Flaten suggested that the proper procedure would be to have a promissory note which recited that it was subordinated to the SBA loan. He testified he had explained to Hield that, as the corporation's attorney, he could not represent Hield without Thyberg's consent, and that Hield should retain other counsel if he felt that was necessary. Flaten's office notes, after the 11 a.m. telephone call, state, "Neither Bill nor Ray indicated whether they would proceed on the basis of a subordinated payout * * *." Flaten heard no more from the parties.[2]

---

2. Added to the assignment at the bottom of the page was a statement typed by Hield's secretary that the assignee agreed to hold assignor harmless on the bank note and one other obligation plus any undisclosed matters pertaining to the corporation. Presumably, this was added because of attorney Flaten's advice to Hield. The parties testified that the wording of this statement was obtained by Thyberg over the telephone from his attorney in Sioux Falls. The record suggests that Hield and Thyberg were doing their own legal work to save on attorney fees.

At the 9:15 a.m. meeting in Flaten's office, Flaten testified that he explained to Hield that the assignment document "purported to be a complete sale of his entire interest both debt and equity in the corporation *for whatever sum was to be inserted in the contract* if it was executed and I told him that the contract would be effective for that purpose." (Emphasis added.)

We have, then, a classic fact dispute. Thyberg and Hield were alone together when they concluded their agreement, and each has a different version of the purchase price finally agreed upon. Both parties were vague in their recollections in important respects and uncertain what the business was really worth. Did Hield and Thyberg, notwithstanding the attorney's warning, agree to another $35,000 undocumented consideration? Or did Thyberg, knowing Hield's need for cash, simply drive a hard bargain, and Hield, not willing to risk a corporate liquidation, accepted $15,000 as payment in full?

The parol evidence rule encourages parties to put their agreements in writing so that there may be fewer, not more, lawsuits. Thus the rule, as generally stated, is that evidence outside a written document is not to be used to vary or contradict the plain terms of the document. The sometimes harsh effect of this rule is, however, ameliorated by a host of exceptions. This is not, however, a case of subsequent modification of the written contract.[3] Nor is it a case of ambiguity in the terms of the written agreement itself.[4] Nor is it a case of the written contract itself being incomplete [5] or silent on a term to which the written contract might not normally be expected to speak.[6] Nor is this a case of no enforceable contract ever being made.[7] If

there is an exception to the rule, we must look elsewhere.

Plaintiff Hield argues that while he assented to the written assignment he did not assent to it as a document setting out the complete understanding of the parties. In other words, Hield contends that the written document did not "integrate" the parties' complete understanding and so the jury should be free to use parol evidence to determine the true, entire agreement. This seems to be an attempt to show a written contract is incomplete by introducing through parol evidence a term flatly contradictory to the written contract. Hield seems to imply that he would never have signed the written document if Thyberg had not promised to pay an additional $35,000. The trial court, however, held as a matter of law, there was no fraud in the inducement. Rather, it appears that Hield is claiming that the written assignment is, in part, illusory; that the written assignment containing the $15,000 stated consideration was executed for the purpose of showing it to the Small Business Administration so that an SBA loan could be obtained—a loan, incidentally, which would be used to pay off the bank mortgage which Hield had personally guaranteed; and that the separate oral agreement for Thyberg to give Hield a $35,000 demand note was, together with the note itself, to be kept secret from the SBA.

Hield wants to show that he intended the consideration to be $50,000 even though he himself wrote in the figure $15,000. In other words, he really wants to show the *purpose* of the written contract is other than as stated in the writing. In *Graham v. Savage*, 110 Minn. 510, 126 N.W. 394 (1910), this court dealt with parol evidence for a written contract alleged to have been

---

3. *Flynn v. Sawyer,* 272 N.W.2d 904, 908 (Minn. 1978); *Duffy v. Park Terrace Supper Club, Inc.,* 295 Minn. 493, 206 N.W.2d 24 (1973).

4. *Republic National Life Ins. v. Lorraine Realty,* 279 N.W.2d 349, 354 (Minn.1979); *Anderson v. Kammeier,* 262 N.W.2d 366, 370 n. 2 (Minn. 1977).

5. *Material Movers, Inc. v. Hill,* 316 N.W.2d 13, 17 (Minn.1982); *Phoenix Publishing Co. v. River-*

side Clothing Co., 54 Minn. 205, 206, 55 N.W. 912, 912 (1893).

6. *Bussard v. College of Saint Thomas, Inc.,* 294 Minn. 215, 224–26, 200 N.W.2d 155, 161 (1972).

7. *Hamilton v. Boyce,* 234 Minn. 290, 48 N.W.2d 172 (1951).

made for the purpose of deceiving third parties. There the plaintiff salesman signed an agreement for the defendant employer to pay him less compensation than he actually was receiving, the purpose of the written contract, according to the plaintiff, being to mislead the defendant's other salesmen. This court reversed a jury verdict for the plaintiff, applying the parol evidence rule. In *Summit Mercantile Co. v. Daigle,* 146 Minn. 218, 178 N.W. 588 (1920), we refused to follow the *Graham* rationale. There, a defendant, seeking to avoid foreclosure of a mortgage on his property, claimed that the mortgage was a sham given to deceive other creditors. This court allowed the defendant to introduce parol evidence in support of his claim but we also stated, "He was bound to sustain his contention by clear, strong and convincing evidence, amounting to more than a preponderance, for contracts thus formally reduced to writing cannot, under the law, be lightly set aside as sham and fictitious." *Id.,* 146 Minn. at 220, 178 N.W. at 588. In *Hamilton v. Boyce,* 234 Minn. 290, 48 N.W.2d 172 (1951), we again expressed doubts about *Graham.* Most recently, in *Flynn v. Sawyer,* 272 N.W.2d 904, 908 (1978), we stated that it was unclear if parol evidence was appropriate to prove that a written contract was signed to defraud or deceive a third party.

This case has a curious twist to it. Hield denies any deceit on his part and stops short of claiming that Thyberg intended to use the written contract to deceive. Hield says only that he assumed Thyberg would tell SBA about the undocumented $35,000 debt.[8] The record indicates that Thyberg got his SBA loan. Presumably he did not disclose to SBA any $35,000 debt to Hield or Hield would surely have put such an admission in evidence. In other words, the

net impact of Hield's claim is that Thyberg defrauded the SBA with the written assignment. This case, then, is not in quite the same factual posture as *Graham,* so we need not decide if *Graham* is still good law. We think, on this record, however, that we should apply the rationale used in *Summit Mercantile Co. v. Daigle, supra.*

We hold, therefore, that where the parties have entered into a written contract, complete and unambiguous on the consideration to be paid, but it is claimed that the consideration was not as stated so that the contract might be used to mislead or deceive a third party, parol evidence is usable; but the party seeking to vary the terms of the written contract in this situation has the burden of establishing his claim by clear and convincing evidence.

Here the jury was not instructed on the clear and convincing evidence standard. While defendant Thyberg did not request the instruction, he did strenuously throughout the trial claim the benefit of the parol evidence rule. We believe the case should be retried with the appropriate burden of proof instruction.

Reversed and remanded for a new trial.

**8.** On direct examination, Hield testified:

Q. Well, were you involved in some scheme to defraud the Small Business Administration?
A. No, sir.
Q. Well, if you weren't going to show this in a *written form so that would not affect his* balance sheet, why isn't that doing something improper?

A. Well, at this point he—whether he was the president of the company he, in effect, then became the owner. I guess this was up to him at that point.
After absolving himself of any responsibility for whatever use the $15,000 written assignment would be put to, Hield went on to testify that he assumed Thyberg would arrange for the $35,000 debt to be subordinated to the SBA loan.